UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and STATE OF INDIANA, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Cause No. 2:22-CV-086-PPS-APR |
| SANITARY DISTRICT OF HIGHLAND, INDIANA, and the TOWN OF GRIFFITH, INDIANA, | ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION AND ORDER**

This is a case about the sanitary sewer systems in the towns of Highland and Griffith. Both communities collect sewage from houses and businesses and send it to Hammond's wastewater treatment plant. But, unfortunately, for years they have collected more sanitary sewage than they are contractually permitted to send to Hammond for treatment. These capacity problems contribute to a phenomenon termed "sanitary sewer overflows" (which I'll shorten to "SSOs")—where the sewers overflow and discharge untreated waste into local waterways, including the Little Calumet River and surrounding wetlands.

The government contends that the overflows violate the Clean Water Act. After years of negotiations with Highland and Griffith, including input from various technical and environmental experts, on April 7, 2022, the government filed this enforcement action and simultaneously lodged proposed consent decrees with the towns. [DE 1; DE 2-1 (Highland Decree); DE 3-1 (Griffith Decree).] After the time for public comment

expired, the government moved for entry of the decrees on August 11, 2022. [DE 6.]

Because Griffith and Highland send their wastewater to the City of Hammond for treatment, this is case is inextricably tied to an earlier case concerning Hammond. *See United States of America v. Sanitary District of Highland*, Cause No. 2:17-CV-048-JTM-PRC. From its point of view, Hammond believes the EPA has been sneaking around behind its back, negotiating deals with Highland and Griffith that greatly impact Hammond, but without giving Hammond any say in the matter. Consequently, Hammond provided a public comment critical of the consent decrees being proposed in this case. Thereafter, even though Hammond did not formally move to intervene under Federal Rule of Civil Procedure 24, I allowed it to participate as a miscellaneous party in this matter and accepted and considered Hammond's brief opposing entry of the decrees. [DE 7; DE 18; DE 19; DE 20; DE 21; DE 22; DE 26.]

On November 10, 2022, a hearing was held on the Plaintiffs' Motion to Enter Consent Decrees, and the parties' supplemental briefing. [DE 26.] After hearing extensive argument on the various issues, I indicated my views that, notwithstanding Hammond's legitimate concerns, the decrees are fair and reasonable and that I intended to enter both of them with an accompanying opinion. [DE 27.] This is that opinion. In sum, as laid out below, because the proposed consent decrees are fair, reasonable, adequate, and consistent with applicable law, the government's motion will be granted, and the decrees will be entered.

2

**Facts**

**A.     The Proposed Consent Decrees**

This action and the proposed consent decrees are years in the making. Given the complex nature of the alleged violations and potential remedies, that is understandable but unfortunate. The overflows generated by the towns' existing sanitary sewer infrastructure harm public health and the environment. What's worse, the affected communities have been well aware of the problem for over a decade. In 2011 and 2012, the EPA issued orders requiring Highland and Griffith to eradicate all SSOs. But the issues have persisted—and, in the best case scenario, will still take years to fully rectify.

Meanwhile, untreated sewage has flowed year after year into the Little Calumet River and surrounding wetlands, further degrading these urban waterways. The government claims that Highland has failed to comply with the EPA's 2011 order and illegally discharged untreated wastewater into protected waterways over 250 times since July 2012, in violation of Section 301 of the Clean Water Act and Indiana law. [DE 1, ¶¶ 25–37, 52–62.] Similarly, on at least 16 days since April 2013, Griffith allegedly discharged untreated sewage into the Little Calumet River or a tributary of the river in violation of the same laws. *Id.*, ¶¶ 38–51, 63–73. The government seeks as relief a permanent injunction directing the defendants to take all steps necessary to eliminate all SSOs in their communities; a judgment assessing civil penalties against the Highland and Griffith for each violation dating back to January 2009; and compensation for its costs and disbursements in this action. *Id.* at 12.

The consent decrees before me propose to resolve this dispute without further litigation. The decrees reflect over five years of work investigating and negotiating the terms of remediating the underlying environmental violations. [*See* DE 6-1 at 6.] The Highland Decree requires the town to adopt a remedial measures plan approved by the EPA and Indiana Department of Environmental Management (IDEM) and imposes post-remedial-measures monitoring requirements. The remedial measures consist of a three-phase project to eliminate SSOs and upgrade piping to send more waste to Hammond. [*See* DE 2-1 at 4–5; App'x A, at A-1, A-12, A-13.] This is a major undertaking that is currently anticipated to conclude by February 1, 2033, barring any extensions approved by the EPA and IDEM. *Id.* at A-13.

Initially, Highland will focus on eliminating two of five total SSO locations and constructing a pump station and piping, which will in turn enable Highland to send to Hammond a maximum peak flow of 32.2 million gallons of sewage per day for treatment. *Id.* at 4, A-12. There are some regulatory hurdles that will have to be cleared. By August 31, 2027, when this phase of the work must be completed, Highland will have to submit a complete sanitary sewer construction permit application, including a signed certification of capacity by Hammond, and secure a valid permit from the State of Indiana to start construction under the decree. *Id.* at 5, A-12. But the juice seems worth the squeeze: 32.2 million gallons per day is a marked increase from the 7.5 gallons Highland is currently contracted to send to Hammond for treatment. *Id.* at 4. And to the extent Highland is unable to obtain a construction permit in a timely manner or if

4

Hammond cannot accept the additional flow from Highland by August 2027, the decree anticipates reasonable extensions of phase one of the project. *Id.* at A-12.

Phase two requires Highland to install new sanitary sewers and eliminate two other SSOs, and is due to wrap up by March 31, 2032. This deadline can get pushed back only to February 1, 2033, at the latest. *Id.* at A-13. The final phase requires Highland to eliminate the remaining SSO location and install yet more sanitary sewer infrastructure, and must be completed by February 1, 2033. *Id.*

Under the Griffith Decree, the town will implement a plan to continue inflow/infiltration reduction, as well as increase its sanitary waste capacity flow to Hammond to 15.5 million gallons per day. This is 10 million gallons more per day than the town is currently contracted to send to Hammond. [DE 3-1 at 4, A-2.] Initially, by October 1, 2026, Griffith must complete a construction project to address direct inflow sources identified in February 2020. *Id.* at A-2. Additionally, the plan requires Griffith to coordinate with Hammond on several capital projects that will enable it to send increased flows for treatment. For example, Griffith must upgrade or replace its Cline Avenue Pump Station to pump wet weather flows of 15.5 million gallons per day to Hammond. *Id.* This process will take account of the timeline for implementation of Hammond's Long Term Control Plan (which I will shorten to "LTCP"), which it has been in the process of finalizing and implementing since entry of its own consent decree in 2017 (more on that in a moment). To that point, if the timeline is extended for Hammond to make sewer upgrades necessary to accept the additional flow from

Griffith, Griffith's own completion date will automatically be extended to two months after Hammond's new deadline. *Id.* After completing the necessary work on the Cline Avenue Pump Station, Griffith will have 30 days to request and obtain written notice from Hammond that it is ready to accept the increased flows and will begin pumping peak flows up to 15.5 million gallons per day to Hammond via the upgraded pump station. *Id.*

When the projects conclude, the towns will be required to compile monitoring data and issue reports with findings to the government to confirm that they have remediated all SSOs. [DE 2-1 at 13 –18, C-2; DE 3-1 at 13–19, C-2.] The towns will both pay penalties for past violations of environmental laws, with Highland paying $175,000 and Griffith paying $33,000, both sums to be split evenly between the United States and the State of Indiana. [DE 2-1 at 12; DE 3-1 at 12.] The decrees also include stipulated penalties in the event of noncompliance or nonpayment of the civil penalty previously outlined. [DE 2-1 at 23–27; DE 3-1 at 23–27.]

Administratively, I will retain jurisdiction to resolve any disputes or modify the terms of the decrees in appropriate circumstances [DE 2-1 at 39; DE 3-1 at 38], and they will dissolve upon the Defendants' compliance with all terms and payment of all penalties owed to the government [DE 2-1 at 40–41; DE 3-1 at 39–40].

### B.    The Hammond Consent Decree and Long Term Control Plan

As noted above, the government previously filed a civil action against Hammond in this district (*United States of America v. Sanitary District of Highland*, Cause No. 2:17-CV-

048-JTM-PRC), alleging that Hammond's sewage system exceeded permitted effluent limitations, including discharges of untreated storm water and sanitary wastewater into the Grand Calumet and Little Calumet Rivers. That case and the underlying CWA violations were resolved through a consent decree entered March 29, 2017. [*See generally* DE 10, Cause No. 2:17-CV-048-JTM-PRC (Hammond Decree).] The 2017 decree itself superseded a prior decree entered in a related action in 1999. [*See* DE 508 and DE 593, Cause No. 2:93-CV-225-JTM-PRC (N.D. Ind.).]

The Hammond Decree requires Hammond to implement a Long Term Control Plan, which has since been approved. [Hammond Decree, ¶ 29; *see also* DE 19 at 1 (acknowledging Hammond's obligations are memorialized in its consent decree and "an associated Long-Term Control Plan"). *See generally* DE 19-3 to DE 19-14 (Hammond LTCP).] Out of the various plans proposed in the LTCP, Hammond and the government agreed on "Alternative 8." [DE 19-9 at 24–26.] With a moniker like that, you'd expect an endeavor akin to the Manhattan Project. It's actually far simpler: Hammond agreed to take steps to separate some of its sewers (nearly all of which had already been addressed by September 2020), utilize existing combined sewer overflow storage, increase wastewater treatment plant capacity, and conduct end-of-pipe treatment. *Id.* at 24.

Under its consent decree agreed to in 2017, Hammond is required to increase its wastewater treatment plant capacity to accept up to 40 million gallons per day of maximum peak flow from Highland and 15.5 million gallons from Griffith. [DE 19-11 at 25 ("When this phase of the project is completed, HSD *will be able to accept* a peak flow of

15.5 MGD from Griffith and 40 MGD from Highland[.]" (emphasis added)).] It is not a coincidence that these flow numbers coincide with those being contemplated under the proposed Highland and Griffith decrees now before me. As prefaced, Hammond's plan contains a timeline with completion dates for the Highland and Griffith projects, *see id.* at 27, and the pending decrees afford Highland and Griffith flexibility on the timing of certain phases of work in the event additional time is needed for Hammond to complete those projects. Like its customer communities, Hammond is subject to stipulated penalties in the event of noncompliance with its obligations under its consent decree, including specific penalties for failure to meet its requirements to develop and implement a final LTCP. [Hammond Decree at 31–39.] In short, the 2017 Hammond Decree, and the pending proposed decrees of Highland and Griffith, mirror one another in many important ways.

One might reasonably wonder (as I did at the hearing), why these decrees weren't all entered simultaneously.  After all, they are mutually dependent. Indeed, as the government told the court back in 2017 in its unopposed motion for entry of the Hammond Decree, "the sewer systems of those communities are integrated with [Hammond]'s, and therefore their [Clean Water Act] compliance challenges are highly related." [DE 9 at 2 n.2, Cause No. 2:17-CV-048-JTM-PRC.] The government went on to say that, because of the interdependence, there were "ongoing settlement discussions" with Highland and Griffith, which the government anticipated would "in the near future . . . result in separate consent decrees," and represented that "[s]hould settlements be

reached, [the government] . . . will request leave to amend the complaint in this action to add as defendants [Highland and Griffith.]" *Id.*

All of that seems entirely sensible. But that's not what happened. Instead, while final judgment was entered in the 2017 case and Hammond worked toward adopting a suitable plan to effectuate the terms of its settlement, the government's negotiations with Highland and Griffith dragged on—*for five more years,* hardly "the near future" as the government told the court back in 2017. All of which prompted the government to do an about face. Because the negotiations of the Highland and Griffith decrees took so long to complete, and judgment was entered in the Hammond case so long ago [DE 11, Cause No. 2:17-CV-048-JTM-PRC], the government tells me that it was more efficient to file a new action against Highland and Griffith without joining Hammond as a party. Of course, this tack had the effect, according to Hammond, of freezing it out of the process.

### C.    Hammond's Public Comments

With all that background spelled out, let's turn back to the matter before me—the proposed consent decrees and the objections to them. After lodging the proposed decrees, on April 12, 2022, the government published a notice of the proposed decrees in the Federal Register. *See* 87 Fed. Reg. 21,669-01, 2022 WL 1080218. Only two public comments were received—both from the City of Hammond. [DE 6-2 (5/11/22); DE 6-3 (7/1/22)]. These comments presaged its position opposing entry of the pending decrees. Hammond claims that the government gave them the back of the hand by never responding to its comments prior to seeking entry of the proposed decrees. For its part,

9

the government says it did consider Hammond's comments but deemed them unpersuasive. [DE 6-1 at 10–11; DE 19 at 11–13 (suggesting government "did not *formally* respond to HSD's comment" (emphasis added)); DE 20 at 2, 4 (arguing Hammond did not object to the "substance" of the proposed decrees or amount of increased flow, but rather underlying financial arrangements).]

The first comment highlighted Hammond's "critical role related to Highland and Griffith achieving compliance with the Clean Water Act," and requested a thirty day extension of the public comment period to permit Hammond the opportunity to review the decrees and meet with Griffith and Highland "to finalize details regarding their implementation." [DE 6-2 at 1.] Hammond noted that it had "several meetings" with Highland and Griffith while the decrees were being negotiated but required additional time to hash out details about the "continued cooperation and coordination" between the communities contemplated by the decrees. *Id.* at 2.

After Hammond's request for additional time was granted, a second comment was received and that is where the rubber meets the road. Hammond noted the proposed plan to eliminate the towns' SSOs required "capital improvements to [Hammond]'s sewer system." [DE 6-3 at 1.] While Hammond remained "willing and able to complete these capital improvements by the later August 31, 2027 deadline provided for in the [decrees], provided it is able to begin design on the capital improvements in July 2022," its commitment was conditional. *Id.* Hammond pointed out that Highland and Griffith had not "committed to payment of their share of

10

[Hammond]'s capital costs for these projects, as required by their respective agreements . . . , despite receiving initial notice over three years ago." *Id.* Hammond further explained that it sent term sheets to Highland and Griffith on May 10, which incorporated results from a cost-of-service rate study completed by an independent consultant on March 7. Per the terms of written agreements executed in 2016 and 2017, Highland and Griffith agreed to set service rates for the next five years according to that study. *Id.* at 2. But, on June 30, Hammond received a joint letter from the communities indicating they did not intend to abide by the cost-of-service rate study. *Id.*

Hammond concluded that failure to abide by the cost-of-service rate study was "a rejection of one of the central conditions of [its] proposed term sheets for expansion of . . . capacities." [DE 6-3 at 2.] Without final agreements on Hammond's proposed terms regarding payments of a fair share of its future LTCP capital costs in hand, Hammond claimed, it was "under no obligation in its current contracts . . . to provide the significant increase in maximum peak flow capacity necessary for [Highland and Griffith] to comply with the [decrees]." *Id.* In its view, neither Highland nor Griffith were likely to meet the later August 31, 2027 deadline proscribed by the decrees — rendering them unworkable in their current form.

### D.    Hammond's Submission Opposing the Government's Motion

Concerned about Hammond's public comments, I held a telephonic status conference on September 1, at which counsel for the parties and Hammond presented their positions. [DE 18.] I indicated on the record that Hammond would be given an

11

opportunity to brief the Court on its position—but allowed Hammond to decide how it wished to proceed procedurally. Hammond could have sought intervention pursuant to Federal Rule of Civil Procedure 24. A number of courts have held that when a private party has interests different than the government in an enforcement action under the Clean Water Act, the usual procedure is to formally seek to intervene in the proceedings during the public comment period. Doing so confers certain rights that may not be afforded to a non-intervenor in the ordinary course. *See, e.g., United States v. United States Steel Corp.*, No. 2:18-CV-127-JEM, 2018 WL 6573164, at *1 (N.D. Ind. Dec. 13, 2018) (granting motions to intervene pursuant to Federal Rule 24(a) filed by nonprofit and City of Chicago, plaintiffs in parallel civil litigation against the defendant arising from overlapping CWA violations, where plaintiffs asserted government would not adequately represent their interests in enforcement action)*; United States v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 11 C 8859, 2012 WL 3260427, at *3, *6 (N.D. Ill. Aug. 7, 2012) (same).

        In *Metropolitan Water Reclamation District of Greater Chicago*, for example, after the Alliance for the Great Lakes and four other environmental organizations intervened in the litigation, the district court considered their arguments opposing the government's motion for entry of the proposed consent decree and granted the motion over the intervenors' objections. *United States v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 11 C 8859, 2014 WL 64655, at *1, *14 (N.D. Ill. Jan. 6, 2014). The intervenors filed an appeal. *See* 792 F.3d 821, 826 (7th Cir. 2015) ("The Alliance's main argument on appeal

can be summed up as: 'it just won't work.'"). The Seventh Circuit, affirming the district court's decision, explained that intervention in this context "carries four rights," namely: (1) to introduce evidence if a case goes to trial; (2) to object to a proposed settlement; (3) to appeal if the intervenor believes the government has accomplished too little; and (4) to enforce any judgment. *Id.* at 824–25.

In this case, Hammond filed a "submission" opposing Plaintiffs' motion to enter the consent decrees in its capacity as a miscellaneous party, to which the government and Highland have replied. [DE 19; *see* DE 20; DE 21.] While Hammond has not formally moved to intervene in this case, the parties' briefs establish a clear intersection between Hammond's financial interests and legal obligations, on one hand, and the terms of the proposed consent decrees, on the other. For that reason, and without passing on the propriety of Hammond further pressing its arguments in this Court or on appeal without first seeking to formally intervene pursuant to Federal Rule 24, I find it appropriate to consider Hammond's submission and its request for relief different from that sought by the government.

Hammond's submission rallies around a common theme: the impropriety of enforcing settlements predicated on costly construction to increase capacity in its wastewater treatment plant, in the absence of final, enforceable contracts dictating the financial terms pursuant to which Highland and Griffith will send those flows. In other words, Hammond shouldn't be on the hook until Griffith and Highland agree to pony up. In its view, the decrees put the cart before the proverbial horse, because without

enforceable financial agreements, neither Highland nor Griffith (nor the government, for that matter) can technically require Hammond to accept the increased flows. It also blames the government for leaving it out in the cold during protracted negotiations with Highland and Griffith and failing to revise the proposed consent decrees in view of its concerns.

Most importantly, the submission lays out the convoluted history of Hammond's contracts with Griffith and Highland and puts a spin on Hammond's "attempts to negotiate" to resolve financial feuds between the communities. [DE 19 at 3–4, 7–10.] Back in 1994, Hammond contracted with Griffith and Highland to take and treat a specified amount of the communities' sewage; those agreements are currently set to run through 2043. [DE 19-1; DE 19-2.] In return for sewage treatment services, the communities pay Hammond specified rates that cover their "proportionate share" of Hammond's operation and maintenance costs. The rates are set according to "the most recently adopted cost of service study and rate study," which determines Hammond's projected operating costs and the proportionate shares each customer community pays Hammond. If the parties have disputes over the rate-setting process, they can take them to an arbitrator. [*See, e.g.*, DE 19-1, §§ 4(B), 6(A)(1)(b), 10.] The contracts also specify how to determine the communities' fair share of Hammond's capital improvement projects and provide that any disputes over capital cost allocations are resolved via binding arbitration. [*See, e.g.*, DE 19-2, §§ 6(A)(2)(b)–(e), 10 .] As far as I understand, despite the protracted nature of the negotiations between the three municipalities and the apparent

14

enmity, no party has invoked either arbitration clause.

What the three communities did do, back in 2016 and 2017, is sign two Letters of Intent (LOI) to end disputes among them about service rates and related contract terms. [DE 19-15; DE 19-16.] They agreed to raise rates until the implementation of a rate structure determined by a jointly commissioned cost-of-service study, and further agreed that this study would set Highland's and Griffith's service rates for a period of five years. The parties also agreed to "negotiate in good-faith" Highland's and Griffith's "proportionate share" of Hammond's LTCP capital costs. [*See, e.g.*, DE 19-15, ¶ 2(a).] The three communities then took four years, to early 2021, to commission the study, which was completed in early March 2022. In May, Hammond told Griffith and Highland that it was implementing the rates established by the study effective July 1, 2022. [*See* DE 19-17; DE 19-18.] But just before the new rates were to go into effect, Hammond received a letter sent on behalf of Griffith and Highland, which indicated that they planned to dispute the cost-of-service study and reject the new rates Hammond wanted to set. [DE 19-19.]

Hammond viewed this letter as "a shocking pulling of the rug from underneath years of work to implement new and fair rates" through a process all three communities had agreed to follow. It worried that "Griffith and Highland were willing to run rough-shod" over Hammond's interest in furtherance of "their deal with the Government." [DE 19 at 9.] Hammond's supposed concern did not stop it from unilaterally implementing the higher rates on July 1, 2022, notifying Highland and Griffith that their

rejection of the study and increased rates was a breach of their binding letter agreement, and invoking the dispute resolution process proscribed in it. [*See* DE 19 at 9; DE 19-20; DE 19-21.]

Hammond claims that since it informally invoked the dispute resolution process Highland has proven a tougher customer than Griffith. Griffith and Hammond have reached an agreement in principle to abide by the cost-of-service study rates. Highland "has doubled-down on its rejection of the [cost-of-service study] and the rates it established," and the parties have plodded through the informal dispute resolution procedure with no resolution. [DE 19 at 9.] If it cannot sort things out with Highland, Hammond raises the specter of invoking the "formal dispute resolution procedure" in its service contracts—meaning they would head to arbitration to resolve the rate issues.

But that's not all. In addition to the rate dispute, Hammond takes issue with Griffith's and Highland's contributions to Hammond's share of capital cost expenditures related to implementation of the long term plan. *Id.* at 10. According to Hammond, there is no "formal commitment" that the Griffith and Highland will pay their fair share of the capital expenditures. As a consequence, the argument goes, because this important issue remains "unsettled," it is yet another stumbling block that militates towards rejecting the proposed consent decrees, at least until the dispute gets ironed out. *Id.*

Rather than enter the decrees, Hammond requests that I: (1) consolidate this case with the earlier case filed against Hammond; (2) hold entry of the Griffith Decree in abeyance for a reasonable period of time to permit Griffith and Hammond to finalize

their agreements on service rates and contributions to Hammond's capital costs incurred under its long term control plan; and (3) as to the Highland Decree, stay the proceedings indefinitely until such time as Highland and Hammond "have had the opportunity to resolve the unsettled" contract terms. [DE 19 at 25–26.] The government strongly opposes "an indefinite extension" as to Highland and urges me to enter and sign the proposed decrees without any further delay, noting "there is a real cost to waiting," both in terms of the environment and public health. [DE 20 at 3.]

On November 10, I heard oral argument from all parties, including Hammond. [DE 26.] Counsel for the communities indicated that good-faith negotiations remain ongoing concerning rates and contributions to Hammond's capital costs; but to date, no finalized agreements have been reached.

### Discussion

In the context of environmental enforcement actions, consent decrees promote efficiency by allowing for "extensive relief" while "free[ing] up enforcement resources for use elsewhere." *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 825 (7th Cir. 2015); *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1054 (N.D. Ind. 2001). Courts in this Circuit approve a consent decree if it is "procedurally and substantively fair," reasonable, and "adequately protects and is consistent with applicable law." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011); *United States v. United States Steel Corp.*, No. 2:18-CV-127-JD, 2021 WL 3884852, at *6 (N.D. Ind. Aug. 30, 2021); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1049.

17

In reviewing a consent decree, a district court "need not inquire into the precise legal rights of the parties, nor reach and resolve the merits of the parties' claims." *BP Expl. & Oil Co.*, 167 F. Supp. at 1049 (citing *Metro Housing Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). While I am not permitted to simply "rubberstamp approval in favor of an independent evaluation" of the issues presented, a strong public policy favors voluntary settlement of litigation, and "[t]his presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the Environmental Protection Agency . . . , which enjoys substantial expertise in the environmental field." *BP Expl. & Oil Co.*, 167 F. Supp. at 1050 (citations omitted); *see also, e.g.*, *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wisc. 2004).

### A.      The Proposed Decrees are Procedurally Fair

In assessing whether the decrees are procedurally fair, I look to the "negotiation process," and must "attempt to gauge its candor, openness, and bargaining balance." *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) (collecting cases addressing procedural fairness in context of enforcement actions under analogous environmental protection statute); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1049. Here, the parties were represented by counsel, aided with the support of technical, engineering, and financial experts, and negotiated the terms of the proposed settlements at arms-length—the standard indicia of procedural fairness.

Hammond acknowledges that it had the opportunity to submit public comments

18

concerning the proposed consent decrees. However, it points out that the government never responded to its comments, it was not invited to participate in the government's negotiations with Highland and Griffith, and, in tension with the government's representations in the 2017 case, it was not added as a party to this action involving two of its customer communities. Hammond argues that the government's multi-suit approach violates notions of procedural fairness. Hammond points to a handful of lower court decisions for the position that its omission from the negotiation process renders the proposed decrees procedurally unfair. [DE 19 at 20–22.] But much like the towns' existing sewer systems, these authorities do not cover the waterfront.

One court has suggested that exclusion of necessary parties from the negotiation process can "raise[] questions of procedural fairness." *United States v. Hardy*, Nos. C90-0695-L(J), C90-0792-L(J), 1992 WL 439759, at *3 (W.D. Ky. Sept. 9, 1992) (concluding that absence of party material to remediation efforts from negotiation process did not render decree procedurally unfair because evidence linking those parties to environmental issues surfaced only after the negotiations had occurred). Even if one casually assumes Hammond is a necessary party to this case, the process parsed in *Hardy* is distinguishable and, in any event, did not raise concerns about procedural fairness.[1] In

---

[1] In *Hardy*, the government sought approval of a settlement with twenty-three defendants in connection with a superfund site but left two other polluters out of the process. 1992 WL 439759, at *1–2. After the government filed an amended complaint adding those two entities as defendants, it sought entry of the originally lodged consent decree. *Id.* at *1. The newly named defendants opposed entry of the decree, arguing that they were not invited to participate in the negotiations and when the government "finally offered settlement, their share of contributions was figured on a different cost basis than any other settling defendant." *Id.* at *2. Noting that evidence linking those entities to the superfund site came to light only after the negotiations had concluded and the later settlement allocation "was done without negotiation," the court found the decree was fairly negotiated.

*United States v. Telluride Co.*, 849 F. Supp. 1400 (D. Colo. 1994), the court found

insufficient evidence of negotiations rendered a proposed consent decree procedurally

unfair and declined to enter it. *Id.* at 1403–05. But the point in *Telluride* was that the

government, in crafting a proposed decree, cannot ignore dozens of public comments

and rely extensively upon representations from the defendants' experts in crafting

appropriate relief. There, the government received "[o]ver forty letters" about the

proposed decrees and addressed only one; and the record did not reflect protracted

negotiations, unlike in this case, which is years in the making. *Id.* at 1404–05.

The same goes for *Comm'r of Dep't of Plan. & Nat. Res. v. Century Alumina Co.*, Nos.

CIV. 2005/0062, 2007/114, 2008 WL 4693550 (D.V.I. Oct. 22, 2008), and *United States v.*

*City of Akron*, 794 F. Supp. 2d 782 (N.D. Ohio 2011), the other two cases on which

Hammond relies. Hammond directs me to part of *Century Alumina Co.* in which the

district court unremarkably observed that it had "no basis for finding that the

negotiations were procedurally unfair," which isn't helpful to Hammond's cause. *See*

2008 WL 4693550, at *4. As for the *City of Akron* case, the court rejected the proposed

consent decree based on facts inapplicable to this case. In essence, the proposed decree

really wasn't accomplishing anything because, despite nearly a decade of negotiations,

the parties remained far apart on "an appropriate LTCP," and the court had "no doubt

that future litigation . . . would be necessary to finally reach an acceptable LTCP." 794 F.

Supp. 2d at 807–08**.**

Here, due to the interconnected nature of the three communities' persistent issues

with SSOs, everyone's cards were on the table. That is true notwithstanding the government's two-suit approach. The terms of Hammond's consent decree and LTCP were crafted in view of the government's contemporaneous (and subsequent) negotiations with Highland and Griffith. That the terms of the decrees, from a flow point of view, mirror one another should come as no surprise. By 2017, it was well understood that Highland and Griffith were unlikely to develop—at tremendous cost—their own sanitation plants. The sanitary waste had to go somewhere other than public waterways. Where was it to go? The answer was Hammond, and, more to the point, Hammond agreed to it in its consent decree. Yet, now I'm being told that somehow Hammond is unfairly being kept in the dark on a paradigm it agreed to five years ago. The logic of this escapes me.

Courts have acknowledged that "direct participation by third parties is not required" to make a proposed settlement procedurally fair. *United States Steel Corp.*, 2021 WL 3884852, at *8 (citing *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1051). That rule has particular application in situations in which parties to the action have been negotiating numerous issues that have nothing to do with the third party. The consent decrees before me contemplate Hammond's involvement in certain aspects of Highland and Griffith's long-term CWA compliance: namely, building infrastructure, as it committed to do in its LTCP, that will enable it to accept increased sewage flows. But Hammond plays no role in various other projects Highland and Griffith have agreed to undertake to eliminate SSOs.

What's more, the record reflects that Hammond remained apprised of developments in the negotiations between the government and Highland and Griffith, and Hammond got the opportunity to publicly comment on the proposed settlements. Importantly, in its public comments, Hammond did not object to the decrees on the ground that they were unfair or contrary to the public interest. And finally, Hammond has been allowed to participate in this case, albeit informally, so its position opposing entry of the decrees is fully briefed on the public record.

In sum, while it may have been more efficient for the government to have proceeded against all three communities in the same action, I am not persuaded that Hammond was left out in the cold to such an extent as to render the proposed decrees procedurally unfair, nor am I persuaded that consolidation of this action with the prior case against Hammond is necessary going forward.

**B.     The Proposed Decrees are Substantively Fair, Reasonable, Adequate, and Consistent with Applicable Law and the Public Interest**

Initially, substantive fairness is centered on "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87; *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1051. Various factors have bearing on whether a proposed settlement is substantively fair, including "(1) a comparison of the strength of the plaintiff's case versus the amount of the settlement offer; (2) the likely complexity, length, and expense of the litigation; (3) the amount of opposition to the settlement among affected parties; (4) the opinion of counsel; and (5) the stage of the proceedings and the amount of discovery already

22

undertaken at the time of settlement." *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1051–52

(citing *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)); *accord*

*Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982).

Hammond contends that the government's "impatience" in lodging the decrees

before the communities' contractual sideshow reached its terminus renders the decrees

substantively unfair. [DE 19 at 22.] The idea is that without financial commitments from

Highland and Griffith, Hammond will be subjected to "further pressure to build

infrastructure for, and accept additional wastewater from, a party who refuses to help

fund those improvements." *Id.* That may be true, but from my point of view, the

suggestion that the government is being "impatient" is, frankly, a little hard to swallow.

The underlying problems that these cases are attempting to address have lingered *for*

*decades.* As the government suggests, the best way to get the three communities to finally

bang out an agreement on cost sharing, is to bind all three to a consent decree. So even if

I accept the proposition that the proposed decrees with Highland and Griffith foist

"further pressure" on Hammond to finally arrive at a cost sharing resolution, I fail to see

how that makes them substantively unreasonable. Indeed, Hammond's submission fails

to identify a single case in which a court found a proposed consent decree was found to

be substantively unreasonable due to a lack of private agreements necessary to

implement the decree's terms. *See id.* at 22–24. I cannot stretch the authorities it has

presented to fit this situation.

The government has been investigating the underlying facts for over half a

decade. Although the proposed consent decrees contemplate extensive relief, they were crafted in light of facts that make out a strong case against Griffith and Highland on the merits, and thus reflect the relative strength of the government's case. Were the government to pursue its claims on the merits, it appears likely that it would be able to obtain similar relief at trial as it is obtaining through the proposed consent decrees. More importantly, notwithstanding the strength of the government's case, due to the technical nature of proving longstanding violations of environmental protection laws, the government's claims would take years to litigate in the absence of a settlement. The proposed decrees avoids that costly process and hopefully will prevent any further fouling of the affected waterways.

What's more, Hammond is the only entity opposed to immediate entry of the decrees, in sharp contrast to other cases in which the government receives dozens of comments expressing opposition to a proposed settlement. In view of these considerations, I find that the proposed consent decrees are substantively fair.

The balance of factors I must consider—whether the proposed decrees are reasonable, adequate, and consistent with applicable law—closely overlap. They require me to consider: "1) the nature and extent of potential hazards; 2) the availability and likelihood of alternatives to the consent decree; 3) whether the decree is technically adequate to accomplish the goal of cleaning the environment; 4) the extent to which the decree is consistent with applicable law; 5) the extent to which the Court's approval is in the public interest; and 6) whether the consent decree reflects the relative strength or

weakness of the Government's case against the Defendant." *United States Steel Corp.*, 2021 WL 3884852, at *11 (citing *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1053).

I have already addressed the last subfactor and concluded that the decrees reflect the relative strength of the government's case. In terms of the hazards at issue, the decrees propose to resolve extensive water pollution in the form of raw sewage flowing into urban waterways in northwest Indiana. Highland and Griffith will be required to eliminate all SSOs flowing from their sanitary sewer infrastructure, including by increasing capacity to pump additional waste to Hammond for treatment. The record reflects a lack of realistic alternatives to sending Hammond increased flows for treatment. Hammond identifies no alternative except further postponing entry of the decrees to finalize its agreements with Griffith and Highland at an indeterminate point in the future. Thus, I find that the first, second, and sixth subfactors listed above support entry of the decrees.

The evidence also suggests that the decrees are adequate to accomplish the goal of ending the SSO issues the government seeks to remedy. On this front, Hammond asserts that the decrees cannot be adequate because there is no guarantee that it will agree to allow its customers to send it additional wastewater flows, and without Hammond's agreement to take the additional flows, the plan will fall apart like a house of cards. Hammond's contractual concerns do not really address the "technical adequacy" of the terms of the decrees as a means to protect the environment. Rather, they go to whether the three communities will ever be able to execute private agreements necessary to

comply with those terms. That is and should remain an issue for the three communities to resolve among themselves. If they cannot hash out the terms, the decrees are designed to induce an agreement within a specified timetable.

Under the decrees, Highland, Griffith, and Hammond have options going forward: they can resolve contractual differences to comply with the terms of their respective decrees, seek reasonable extensions to do so, or pay penalties for noncompliance. As previously explained, the decrees anticipate the possibility of reasonable delays to phases of work, as well as noncompliance. Delays are permitted with the government's approval under certain conditions. In the case of noncompliance, the government can seek civil penalties or other relief in court. The terms of the communities' existing contracts provide a dispute resolution process if they cannot come to a reasonable resolution on new service rates and contributions to Hammond's LTCP capital costs. At bottom, the contractual issues Hammond has raised really address how much Highland and Griffith will have to pay for additional services contemplated under the proposed decrees and capital improvements required under Hammond's LTCP—not whether the plans contemplated by the decrees, when fully effected, will resolve the underlying pollution. By bringing clarity to the timing of phases of work to remedy the communities' interconnected SSO issues, along with the cost of noncompliance, entry of the proposed decrees will help move the ball forward in private negotiations among the three communities. Frankly, it is unsettling, given the longstanding nature of these pollution problems, to contemplate an alternative course in which the government must

26

either directly regulate the prices in private contracts executed between three
sophisticated communities representing a population of over 100,000 people, or instead
delay protecting the environment where those individuals reside. In any case, as they
currently stand, the decrees are adequate to effect the desired purpose of resolving the
underlying pollution.

The remaining factors—whether entry of the decrees is in the public interest and
consistent with applicable law—are "[o]f particular importance" to my analysis. *United
States Steel Corp.*, 2021 WL 3884852, at *6. Of course, a consent decree "may not
contravene the statute upon which the initial claims are based."*BP Expl. & Oil Co.*, 167 F.
Supp. 2d at 1054. In assessing whether a decree is consistent with the public interest, I
consider the "public objectives sought to be attained by Congress." *United States v.
Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010) (quoting *Williams v.
Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983)); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1054
("[T]he most important factor as to public policy is whether the decree comports with
the goals of Congress."). "Congress' purpose as reflected in the language of the Clean
Water Act is to " 'restore and maintain the . . . integrity of the Nation's waters.'" *Cnty. of
Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020) (citing 33 U.S.C.
§ 1251(a)). To promote this purpose, the CWA and Indiana Code generally ban the
discharge of pollutants unless authorized by a National Pollutant Discharge Elimination
(NDES) permit issued by an authorized state. *See* 33 U.S.C. §§ 1311(a), 1342; Ind. Code
§ 13-30-2, 327 I.A.C. § 5-2-2.

The proposed consent decrees are consistent with the goals of the environmental statutes and are in the public interest. The decrees include detailed requirements designed to completely eliminate existing the SSOs, as well as robust monitoring and reporting requirements to curtail any newly discovered SSOs, and strict penalty provisions; they contemplate a "thorough system of compliance measures" to address "the root causes of" the SSO issues; and they are accessible to the public. *United States v. United States Steel Corp.*, 2021 WL 3884852, at *14–15; *see also United States v. Cleveland-Cliffs Burns Harbor, LLC*, No. 2:22-CV-26-PPS-JEM, 2022 WL 1439213, at *3 (N.D. Ind. May 6, 2022) (citing *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir. 2000)). They should therefore advance the goal of reducing pollution and protecting the environment in line with the public interest. Strong public policy in favor of voluntary settlement of disputes lends further support to my conclusion that entry of the decrees is in the public interest. *United States Steel Corp.*, 2021 WL 3884852, at *6 (citing *Cannons Eng'g Corp.*, 899 F.2d at 84).

One final point requires my attention. Hammond has indicated that it does not oppose entry of the Griffith Decree, so long as Hammond and Griffith are given "a reasonable time" to finalize financial agreements pursuant to which Griffith will send Hammond additional wastewater flows. [DE 19 at 13–14.] At the hearing on Hammond's submission, nearly two months later, counsel for Griffith and Hammond indicated that they continue to make progress toward a final agreement. I find that a reasonable time has passed for such purposes, and in light of the foregoing considerations, immediate

28

entry of the proposed decrees is warranted.

## Conclusion

Upon consideration of all the evidence, the parties' arguments, and Hammond's submission, I find that the proposed consent decrees are "substantively and procedurally fair," reasonable, and "adequately protect[] and [are] consistent with applicable law." *See George A. Whiting Paper Co.*, 644 F.3d at 372; *United States Steel Corp.*, 2021 WL 3884852, at *6; *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1049. Therefore, Plaintiffs' Motion to Enter Consent Decrees with Highland Sanitary District and Town of Griffith, Indiana [DE 6] is **GRANTED**. The decrees will be entered forthwith.

**SO ORDERED.**

ENTERED: December 9, 2022.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT